**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 23 2019

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

| | |
|---|---|
| MICHAEL AVERY, on behalf of himself and all others similarly situated | ) Case No. <br> ) 4:19CV927-LPR <br> ) |
| Plaintiff, | ) <br> ) |
| | ) **JURY TRIAL DEMANDED** |
| vs. | ) <br> ) |
| UNITI GROUP INC., KENNETH A. GUNDERMAN, MARK A. WALLACE, | ) <br> ) <br> ) This case assigned to District Judge *Rudofsky* |
| Defendants. | ) and to Magistrate Judge *Ray* <br> ) |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff Michael Avery ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Uniti Group Inc., formerly known as Communications Sales & Leasing, Inc. ("Uniti" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of Uniti common stock between April 20, 2015 and June 24, 2019, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Uniti maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein occurred in this District.

5.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Michael Avery purchased Uniti common stock during the Class Period, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby. Please see Exhibit A.

7.    Defendant Uniti Group Inc., formerly known as Communications Sales & Leasing, Inc. ("Uniti"), is a real estate investment trust ("REIT").  Uniti is a Maryland corporation with its principal executive offices located in Little Rock, Arkansas.  Uniti common stock trades under the ticker "UNIT" on the NASDAQ, an efficient market.

8.    Defendant Kenneth A. Gunderman ("Gunderman") is, and at all relevant times was, during the Class Period, Chief Executive Officer ("CEO") and President of Uniti.

9.     Defendant Mark A. Wallace ("Wallace") is, and at all relevant times was, during the Class Period, Chief Financial Officer ("CFO") and Treasurer of Uniti.

10.    Defendants Gunderman and Wallace are collectively referred to herein as the "Individual Defendants."

11.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

12.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Uniti, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that

the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Uniti, each of the Individual Defendants had access to the adverse undisclosed information about Uniti's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Uniti and its business issued or adopted by the Company materially false and misleading.

15.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Uniti common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Uniti's business, operations, management, and the intrinsic value of Uniti common stock; and (ii) caused Plaintiff and other members of the Class to purchase Uniti common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

17.     Uniti, formerly known as Communications Sales & Leasing, Inc., is a REIT engaged in the acquisition and construction of mission critical infrastructure in the communications industry. In February 2014, the Company was incorporated as a wholly-owned subsidiary of Windstream Holdings, Inc. ("Windstream"), a telecommunications company, and spun-off from Windstream Holdings in 2015 (the "Uniti Spin-Off").

18.     Uniti principally focuses on acquiring and constructing fiber optic broadband networks, wireless communication towers, copper and coaxial broadband networks, and data centers. Operations are managed in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and Talk America.

19.     In the Uniti Spin-Off, Windstream sold telecommunications network assets to Uniti in exchange for Uniti issuing common stock and indebtedness and cash obtained from borrowings

under Uniti's senior credit facilities. In connection with the Uniti Spin-Off, Defendant Gunderman was Windstream's financial advisor while working at Stephens Inc., a privately held investment banking/financial services firm and Robert Gunderman, his brother, was Windstream's then-Treasurer and current CFO.

20.    According to Uniti, in connection with the Uniti Spin-Off, Windstream sold certain of its telecommunications network assets, including fiber and copper networks and other real estate and a small consumer competitive local exchange carrier to Uniti. Uniti then leased these assets back to Windstream via a "Master Lease" agreement. A substantial portion of Uniti's leasing revenues are derived from the Master Lease. While the Master Lease was between Uniti and Windstream, the Windstream operating subsidiaries were the direct beneficiaries of the lease and in effect were the *de facto* lessees of the fiber and copper network assets.

21.    Windstream is Uniti's largest customer, accounting for more than two-thirds of Uniti's annual revenues for every year since the Uniti Spin-Off.

### The Uniti Spin-Off/Leaseback Violated Restrictive Covenants in Windstream's Note Indenture

22.    In January 2013, Windstream issued senior unsecured notes guaranteed by certain of its subsidiaries in an aggregate principal amount of $700 million. Unbeknownst to the investing public, the indenture governing the sale of the notes (the "Indenture") included a number of restrictive covenants, one of which prohibited the operating subsidiaries from engaging in "Sale and Leaseback Transaction[s]," absent certain exceptions. These restrictive covenants prohibited Windstream's operating subsidiaries from selling Windstream's fiber and copper network assets to a third party and then leasing those assets back.

23.    A violation by Windstream of the restrictive covenants governing its notes could lead to the noteholders taking action to accelerate the notes, obligating Windstream to immediately

repay hundreds of millions of dollars, which could bankrupt Windstream. Moreover, Windstream's violation would have severe financial consequences for Uniti, its operating results, liquidity, and its ability to access credit and satisfy existing debt obligations.

24.     Prior to the Class Period, Defendant Gunderman, along with other Windstream executives, told regulators during the regulatory approval process that the Windstream operating subsidiaries would have "the exclusive right to use, access, and operate the assets" through the sale-leaseback arrangement. However, at the same time, Windstream general counsel, John Fletcher, was assuring potential investors that Windstream Holdings would be the lessee of the assets and omitted any disclosure to investors that the Windstream operating subsidiaries would actually be the parties using, accessing, and operating the assets.

25.     Actually, throughout 2014, Fletcher acted as General Counsel for both Windstream and Uniti and worked to convince a number of state utility regulatory bodies that they should approve Windstream's sale and leaseback arrangement. His rationale for approval was that the Windstream operating subsidiaries would in essence be leasing the assets back and retaining exclusive, long-term access to and control of them. Fletcher drafted and signed, on behalf of Uniti and Windstream, the application to the Alabama Public Service Commission ("PSC"), which was filed in Montgomery, Alabama on July 31, 2014.   In the application, Fletcher requested authorization to transfer certain fixed assets of the "WIN Companies" (that are made up of the operating subsidiaries) to CS&L, and CS&L would lease them back to Windstream on a long term basis for the exclusive use and benefit of the WIN Companies.  Fletcher also stated that the transaction would be "virtually invisible to the WIN Companies' customers but was being done simply to, among other things, enable the WIN Companies to improve their financial condition."

26.     The Kentucky PSC made its determination based on a hearing it held on November 13, 2014, in which Robert Gunderman testified that the operating subsidiaries were the true beneficiaries of the arrangement, and that the agreement between CS&L and Windstream Holdings is "just for administrative ease in terms of transacting – transacting the lease between entities," but that it is "for the benefit of the operating subsidiaries." Based on this testimony, the Kentucky PSC gave approval stating that "the Lease will provide the operating companies with the exclusive rights to use the distribution systems."

27.     Also during this November 13, 2014 hearing, Robert Gunderman assured Kentucky regulators that the proposed transaction would not violate any of Windstream's debt agreements or restrictive covenants:

> Q: So my question to you would be, are there covenants in any of Windstream's debt agreements that would limit Windstream's operations, businesses, or financial positions company-wide?
>
> A: As part of this transaction, we have no concerns with any covenants within our indentures or our existing credit agreement.

28.     While Windstream was telling regulators that the Windstream operating subsidiaries were the true beneficiaries of the leaseback plan, and the lease was simply being entered into at the corporate level for administrative benefits, the Windstream insiders, who were either to become Uniti insiders, worked closely on this with Uniti insiders, or were closely related to a Uniti insider, knew that this was a direct violation of the Indenture. As Fletcher stated in testimony during litigation commenced in connection with the Indenture (the "Indenture Litigation"):

> Q: The question is, at the time that this transaction was being planned, you were aware that if the transferor subsidiaries signed the master lease, that would have been a clear violation of the indenture at issue in this case.
>
> A. Yes.

29.     Windstream executives succeeded in obtaining regulatory approval by asserting that the operating subsidiaries were the true beneficiaries of the Master Lease, while at the same time, promoting the transaction to investors without mention of the restrictive covenant violation.

30.     The operating subsidiaries would use their assets and pay all rent as required under the lease. Furthermore, Uniti would only receive payment from Windstream Holdings after and if it received payment from the operating subsidiaries.

31.     Defendant Gunderman, who worked closely with Windstream in developing and implementing the Spin-Off and sale-leaseback plan, was fully aware of Windstream's messaging about the transaction to state regulators.

32.     On March 25, 2015, the Windstream board approved the Uniti Spin-Off. Windstream had done an end-run around the restrictive covenants in the Indenture and gave shareholders the impression that they were not violating these restrictions.     Windstream Corporation (now known as Windstream Services), borrowed millions of dollars with the specific condition that they would not sell and leaseback assets, and then set up an arrangement whereby their operating subsidiaries would sell their assets to Uniti which would then lease them back to Windstream Holdings, for the exclusive use by the subsidiaries. Then, Windstream Holdings, upon receiving rent payments from the subsidiaries, would pay Uniti under the Master Lease. Windstream and Uniti insiders knew this was a violation of the Indenture, despite their public assertions to the contrary.

33.     Thus, by the start of the Class Period, Defendants knew or recklessly disregarded that their actions were an attempt to avoid the Indenture's restrictive covenants which exposed Windstream to a material risk that the transaction could be successfully challenged by Windstream noteholders in court, as it ultimately was. This information, and the material and likely risks posed

to Windstream's viability (and ultimately Uniti's as Windstream is Uniti's largest customer),

should have been made available to shareholders. Instead, throughout the Class Period,

Defendants repeatedly kept this information from investors.

## Materially False and Misleading
## Statements Issued During the Class Period

34.    On March 26, 2015, Defendant Gunderman wrote a letter to "Future Shareholder

of Communications Sales & Leasing, Inc.," in which he described the sale and leaseback

arrangement and the value it was creating for the Company,

> It is our pleasure to welcome you as a shareholder of our company,
> Communications Sales & Leasing, Inc. ("CS&L"). Following the distribution
> of no less than 80.1 percent of the outstanding shares of CS&L common stock
> by Windstream Holdings, Inc. to its shareholders, CS&L will be an
> independent, publicly traded real estate investment trust that will own, acquire
> and lease distribution systems serving the communications infrastructure
> industry and potentially other industries. We will strive to be a significant
> provider of capital and financing to the communication industry.
>
> Our initial properties will include, among other things, an extensive
> communications distribution system, comprised of approximately 66,000 route
> miles of fiber optic cable lines, 235,000 route miles of copper cable lines, and
> central office land and buildings across 37 states that are currently owned by
> Windstream. This distribution system will be leased to Windstream Holdings
> on a long-term, triple-net basis. We expect to diversify our tenant base in the
> future by acquiring additional properties and leasing them to other local,
> regional and national telecommunications providers. We also expect to grow
> and diversify our portfolio through the acquisition of properties in different
> geographic markets, and in different asset classes.
>
> Our goal at CS&L is to create value for our shareholders and we plan to
> accomplish this by growing our dividend distributions over time. CS&L
> initially expects to pay an annual dividend of $2.40 per share.

35.    Also on March 26, 2015, in another letter to Shareholders of Windstream, which

was filed with the SEC and attached to a Form 8-K signed by Defendant Gunderman, it stated that

after the Spin-Off, "CS&L will lease the assets to Windstream Holdings through an exclusive long-

term triple-net lease." Additionally, Uniti highlighted the financial stability of Windstream and its

ability to pay the lease obligations for years to come when it stated under the heading "Financially Secure Tenant," that "Windstream's liquidity position, modest leverage and ability to generate significant free cash flow should provide it with the ability to pay the annual lease obligations to CS&L [Uniti] for the foreseeable future."

36.     The Class Period starts on April 20, 2015. On that date, Uniti common stock began trading on the NASDAQ.

37.     The statements referenced above in ¶¶ 34 and 35 were materially false and misleading as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     that the sale-leaseback transaction between Windstream and Uniti was a highly risky attempt to make an end-run around the restrictive covenants in the Indenture;

(b)     that Windstream was violating the restrictive covenants contained in its notes by entering into the sale-leaseback arrangement with Uniti and that this violation was going to lead to the noteholder accelerating the notes obligating Windstream to immediately repay hundreds of millions of dollars which would bankrupt Windstream and have severe financial consequences for Uniti; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about Uniti, its revenues, earnings and prospects.

38.     On November 14, 2016, Uniti held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Gunderman stated without condition that they would consider additional sale-leasebacks with Windstream misleadingly implying that doing so imposed no risk, stating in pertinent part,

"[I]f [sale-leaseback] is an option that Windstream wants to pursue, we are very happy to engage in discussions around that to see if there is something that makes sense for both of us.

I think that in general if we can find ways to help our largest customer and to do things that are credit enhancing for our largest customer, we are going to look very, very hard at that. But as we have mentioned before, our goal is to diversify and we will always look at potential sale-leaseback options, additional sale-leaseback options with Windstream in the context of other options that we have and we will prioritize those appropriately at the time.

39.    On February 23, 2017, Uniti filed its Form 10-K for Fiscal Year 2016, with the SEC which was signed by Defendant Gunderman and Defendant Wallace (the "2016 Form 10-K"). Uniti misleadingly characterized Windstream Holdings as the "lessee of the Distribution Systems pursuant to the Master Lease," without disclosing that the Windstream operating subsidiaries were the *de facto* lessees, as they had admitted to state regulators, and without disclosing any risk of a violation of the restrictive covenant in the Indenture.

40.    In the 2016 Form 10-K, Uniti highlighted the risk that Windstream represented a significant portion of its business and that Uniti's success depended significantly on the viability of Windstream, describing Windstream as its "anchor tenant" that "provide[d] [Uniti] with a base of stable and highly predictable rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base," but made no mention of the risk associated with the sale-leaseback arrangement.

41.    In the 2016 Form 10-K, Uniti stated that because Windstream represented a substantial portion of Uniti's revenue, there could be a material impact on Uniti's results if Windstream experiences operating difficulties. The 2016 Form 10-K stated in pertinent part as follows:

Because a substantial portion of our revenue is derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity and/or financial condition if Windstream experiences operating difficulties and becomes unable to generate

sufficient cash to make payments to us under the Master Lease. In recent years, Windstream has experienced annual declines in its total revenue and sales. Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

42.     The statements referenced above in ¶¶ 38-41 were materially false and misleading for the reasons stated in ¶ 37.

43.     On August 3, 2017, Uniti filed a Form 10-Q filed with the SEC which was signed by Defendant Wallace and vice president and Chief Accounting Officer, Blake Schuhmacher. In the Form 10-Q, Uniti again described the Spin-Off of Uniti from Windstream and the sale-leaseback arrangement as well as the importance of Windstream's leasing revenue, without ever mentioning the risks associated with Windstream's restrictive covenant violation. The Form 10-Q stated in pertinent part as follows:

> On April 24, 2015, Uniti Group Inc. (the "Company", "Uniti", "we", "us" or "our"), formerly known as Communications Sales & Leasing, Inc., was separated and spun-off (the "Spin-Off") from Windstream Holdings, Inc. ("Windstream Holdings" and together with its subsidiaries, "Windstream") pursuant to which Windstream contributed certain telecommunications network assets, including fiber and copper networks and other real estate (the "Distribution Systems") and a small consumer competitive local exchange carrier ("CLEC") business (the "Consumer CLEC Business") to Uniti and Uniti issued common stock and indebtedness and paid cash obtained from borrowings under Uniti's senior credit facilities to Windstream. In connection with the Spin-Off, we entered into a long-term exclusive triple-net lease (the "Master Lease") with Windstream, pursuant to which a substantial portion of our real property is leased to Windstream and from which substantially all of our leasing revenues are currently derived.

44.     That same day, Uniti held an earnings conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, in response to a question about Windstream's decision to cut its dividend, Defendant Gunderman characterized the

lease payments to Uniti from Windstream as "very, very safe and a very high-priority payment from their perspective," and they "remain highly confident in that lease payment."

45. Then, on September 21, 2017, Aurelius Capital Master, Ltd. ("Aurelius"), the beneficial owner of more than 25% of Windstream's outstanding Notes under the Indenture, provided written notice to Windstream that the Uniti Spin-Off and sale-leaseback transaction was a violation of the Indenture's restrictive covenants.

46. On September 25, 2017, Windstream acknowledged in a Form 8-K it filed with the SEC that it received the Notice of Default but denied that any prohibited sale-leaseback transaction occurred and played down the issue.

47. The market was unconvinced, and the news had an immediate negative effect on the price of Uniti common stock. On September 26, 2017, the first full day of trading after Windstream filed its Form 8-K, the price of Uniti stock declined from $17.36 per share at the close of trading on September 25, 2017 to $15.65 per share at the close of trading on September 26, 2017, a decline of nearly 10%. The price of Uniti stock continued to decline on September 27, 2017 and by September 29, 2017, with no other material company-specific information disclosed, the price of Uniti stock fell another 7% to $14.66 per share.

48. On October 4, 2017, Defendant Wallace participated in the Deutsche Bank Leveraged Finance Conference where he made no mention of the Windstream default allegation. However, he did take the opportunity to tout the structure of the Windstream lease stating in pertinent part as follows:

> We do think the Windstream lease in and of itself is well-structured. It is structured, as I mentioned, to be as a master lease. It is important to Windstream from an operations standpoint in terms of the scale and the number of customers that they serve by having access to the lease. It is a master leases. As we've said before, they are designed to be in the – as a single lease, they're designed to be indivisible. It is a single rent payment, so it's not – it's designed so that it can't be subdivided

or cherry picked. It is – in any sort of a distress situation, it is required to be either accepted or rejected in full. And acceptance would require that the lease be – that the tenant be in compliance. Windstream is the carrier last resort, so it's important for Windstream to continue to have access to the lease network to serve the customers and to fulfill the regular required obligations as well. So we think the master lease is well-crafted and we think it's a priority payment from our standpoint and from Windstream's standpoint as well.

49.     And when asked about "the elephant in the room," which was Windstream's financial situation, Defendant Wallace asserted that Windstream's decision to cut the dividend was actually "credit enhancing," and they have no concerns around Windstream's financial situation. The following exchange took place:

**Unidentified Analyst**

Okay. All right. So getting to some Q&A. Towards the end of the presentation, we talked about Uniti Leasing. And I just want to get the elephant in the room with Windstream. So Windstream is a financial situation. It's been a key focus for investors, especially considering 70% of your revenue still comes from them. Especially true, I think, following a weaker second quarter where Windstream eliminated its dividend. So maybe to start, can you talk about Windstream's decision to cut its dividend? And more importantly, I guess, what that implies for your rental revenues coming from them?

**Mark A. Wallace** - *Uniti Group Inc. - CFO, EVP and Treasurer*

Sure. So I think Windstream, on their decision to eliminate the dividend, I think from our standpoint, from a landlord standpoint, we find it to be credit-enhancing. So obviously, with that decision, they'll be retaining more cash flows in their business. So we think it's credit-enhancing from that standpoint. Now obviously, I would say that I think the market had a negative reaction to it based on the pressure that resulted on their securities from that. And I think, as far as I can tell, I think that's a result of, I think, people viewed the dividend elimination as being a harbinger of -- or a foreshadowing that there's -- that Windstream's future results would not be what the market was expecting those to be, and that, that was -- that would be the reason for them to eliminate the dividend. I don't think that's what they intended at all. I think they intended it to be just a capital finance position. They felt like they weren't getting credit for the dividend. But -- so we were certainly surprised by the reaction to it. I think they were as well. I do think that to the extent that there was -- that I'm correct about what I believe, people took it to mean from a perception standpoint. I think Windstream has been at conferences. They hosted a separate conference with investors, and they tried to make sure that -- correct any misperceptions in the marketplace. So as I've kind of heard them articulate

their strategy, they're focused on, and certainly, you should pay attention to what Windstream says about its own operations, so they should be the primary spokesman, not me. But as I understand it, I think they have a lot of initiatives going on right now that I fully expect them to be successful at executing on, whether it be the synergy realization from Earthlink and Broadview, whether it be the reduction of interconnection costs. I think they've spoken about CapEx and working capital being improved in the second half of the year versus first half of the year. They've also talked recently about asset sales and looking at monetizing some of their unutilized fiber. So I think all those things were good. I think they've got a lot of things they're focused on right now. And as I said earlier, I think I'll expect them to be successful to execute.

\*       \*       \*

**Unidentified Analyst**

How about when we think about leverage for the business, can you talk about your preferred target leverage range for the company? And whether you would consider potentially taking that lower given some of the concern around Windstream's financial situation?

**Mark A. Wallace** - *Uniti Group Inc. - CFO, EVP and Treasurer*

So our -- what we've said is that we've been on a net leverage basis at about 5.7 to 5.8x. We've been in that -- have said for a while, that's our target range and there's no change in that target range. The actual kind of month-to-month leverage will change as we draw down on the revolver for acquisitions and then term out and replace that with permanent capital. But the target range is still about the same as it has been.

**Unidentified Analyst**

Okay. And does Windstream's financial situation impact how you think about that on a go forward basis?

**Mark A. Wallace** - *Uniti Group Inc. - CFO, EVP and Treasurer*

No. No change.

50.     On October 12, 2017, U.S. Bank, as Trustee filed the Indenture Litigation alleging that the 2015 Uniti Spin-Off and sale-leaseback transaction violated the Indenture. The action was filed by the Trustee in the United States District Court for the Southern District of New York.

51.     On November 2, 2017, Uniti filed a Form 10-Q with the SEC which was signed by Defendant Wallace and Blake Schuhmacher. In the Form 10-Q, Uniti acknowledged that

Windstream Services received a notice of default dated September 21, 2017. The notice alleged, among other things that Windstream Services violated certain restrictive covenants of the Indenture governing the Windstream Notes in connection with Windstream's Spin-Off of Uniti Group. Uniti did not reveal that it had been aware of this risk and downplayed the magnitude of it.

52.     That same day, Uniti held an earnings conference call with analysts and investors to discuss the Company's earnings and operations. During a conference call, Defendant Gunderman stated that they would not respond to questions regarding Windstream's current litigation but "remind[ed]" everyone that Windstream had "very competent counsel and advisors involved in the initial spin-off."

53.     On November 7, 2017, at the Wells Fargo Media & Telecom Conference, Defendant Gunderman voiced his frustration with the fact that there was even a question about the validity of the sale-leaseback transaction and stated that he remains very confident in the lease payments, stating in pertinent part, as follows:

> We find it extremely frustrating, especially on behalf of our shareholders that there's so much turmoil going on, and especially when we think the claim itself is just manufactured. We've been following it very, very closely. We've contingency planned for all conceivable outcomes. We've done a deeper dive on our lease and our different scenarios than we ever have before and continue to be highly confident in the leased, lease payment, the protections that we have in all scenarios. So none of that has changed. And it's really the same thing we've been saying from Day 1, even before we were spun out. So none of that has changed. And we do think that the trends and the tide are moving in Windstream's favor in terms of the things that they're dealing with. And there's going to be a lot more clarity on all of this over the coming weeks. But in the meantime, we're staying focused on our business. We're staying focused on growing. And to your question, there have been no conversations with Windstream about renegotiating the lease, not in the past and not right now. So . . .

54.     In reaction to Defendant Gunderman's positive statements concerning the Indenture Litigation, the price of Uniti stock reversed its decline. From November 7, 2017 through February 15, 2019, the stock price rose from $16.53 to $19.98, an increase of over 14%.

55.     Then, on February 15, 2019, United States District Court Judge Jesse M. Furman released his findings that the Uniti Spin-Off and the sale-leaseback transaction breached the Indenture. His decision was based on a number of factors including the fact that the subsidiaries had exclusive use of the leased property and the fact that the subsidiaries subleased the property to others which they wouldn't be able to do without a leasehold interest in the property. Further, the subsidiaries are paying "healthy consideration" for their right to use the assets. The court concluded that it "walks like a lease and talks like a lease . . . because it is a lease."

56.     The court even went the additional step of holding that Windstream was "judicially estopped from denying that the [Windstream operating subsidiaries] 'lease' the Transferred Assets."   The court explained, "having benefited from repeated statements to state regulators that the [Windstream operating subsidiaries] would lease back the Transferred Assets, [Windstream] Services is estopped from now denying that the [Windstream operating subsidiaries] did in fact lease those assets – even if doing so would not serve its interests."

57.     The court concluded that the 2015 transaction was plainly a sale and leaseback and making Windstream Holdings the sole signatory on the Master Lease did not change those facts. Accordingly, the Trustees and Aurelius are entitled to a judgment against Windstream and awarded Aurelius a money judgment of over $300 million.

58.     In response to this, the price of Uniti stock declined over 45% from $19.98 per share when the market closed on February 15, 2019, to $10.87 when the market opened on February 19, 2019, the next trading day.

59.     Over the next three days, the price of Uniti stock declined further to $9.23 when the market closed on February 22, 2019. From February 15, 2019 through February 22, 2019, the stock declined over 53%, which can all be attributed to the Windstream default.

60.     On February 25, 2019, Windstream announced it had filed for Chapter 11 bankruptcy as a result of the judge's decision in the Indenture Litigation.

61.     In a press release issued on February 27, 2019, Defendant Gunderman, in an unsubstantiated attempt to stop the bleeding, stated that they "believe [Windstream] will successfully navigate through the reorganization process."

62.     On March 18, 2019, Uniti filed its Form 10-K for Fiscal Year 2018, with the SEC which was signed by Defendants Gunderman and Wallace (the "2018 Form 10-K"). In the 2018 Form 10-K, Uniti stated that its auditors, PricewaterhouseCoopers LLP, have "substantial doubt as to whether [Uniti] could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and its potential uncertain effects on the Master Lease." They added that they included the going concern opinion letter in their 2018 audited financial statement because not doing so would be a breach of the covenants of their Credit Agreement but that they "expect Windstream will continue to perform on the Master Lease and believe it is unlikely that Windstream will reject the Master Lease because the Master Lease is central to Windstream's operations."

63.     In the 2018 Form 10-K, Uniti further downplayed the concerns stating that it was their expectation "that any disruption in payments by Windstream would be limited" because Uniti's Master Lease is essential to Windstream's operations and based on this, Uniti "would have enough liquidity to fund our cash needs within one year after the date the financial statements are issued."

64.     Uniti further repeatedly asserted that "management has concluded the probability of a rejection of the Master Lease to be remote" and provided financial statements that do not include any adjustment that might be necessary if the Company is unable to continue as a going concern.

65.     Further, in the 2018 10-K, Uniti added that "we anticipate that we will have sufficient access to liquidity to fund our cash needs," and will be "continuing to invest in our network infrastructure across our Uniti Leasing, Uniti Fiber and Uniti Towers portfolios."

66.     The statements referenced above in ¶¶ 61-65 were materially false and misleading as they failed to disclose that Uniti was running out of sufficient liquidity and would soon need to issue additional debt if it was to continue operations.

67.     Despite Uniti's repeated assertions that they did not have any liquidity concerns, on June 24, 2019, Uniti announced a note offering of $300 million aggregate principal amount of exchangeable senior notes due 2024, with an option to purchase up to an additional $45 million aggregate principal amount of the Exchangeable Notes during a 13-day period beginning on, and including, the first day on which the Exchangeable Notes are issued.

68.     As a result of this, the price of Uniti stock dropped another 12%, from $10.69 when the market closed on June 24, 2019, to $9.38 when the market closed on June 25, 2019, on very heavy volume.

69.     The market for Uniti common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Uniti common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Uniti common stock relying upon

the integrity of the market price of Uniti common stock and market information relating to Uniti and have been damaged thereby.

70.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Uniti common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

71.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Uniti's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Uniti and its business, prospects, and operations, thus causing the price of Uniti common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Uniti common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market the inflation in the price of Uniti stock was removed and the price of Uniti stock declined dramatically causing loss to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

72.     As alleged herein, Uniti and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading, knew that such statements or documents would

be issued or disseminated to the investing public, and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations

of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue

of their receipt of information reflecting the true facts regarding Uniti, their control over, and/or

receipt and/or modification of Uniti's allegedly materially misleading statements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning Uniti, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

73.     During the Class Period, as detailed herein, Defendants made false and misleading

statements by misrepresenting the Company's business and prospects and engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the price of Uniti common

stock and operated as a fraud on Class Period purchasers of Uniti common stock. Later, when

Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the

price of Uniti common stock fell precipitously, as the prior artificial inflation came out. As a result

of their purchases of Uniti common stock during the Class Period, Plaintiff and other members of

the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Uniti who knew that those statements were false when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

75.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Uniti stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Uniti stock; and

(e)     Plaintiff and other members of the Class purchased Uniti common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

76.     At all relevant times, the market for Uniti common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Uniti filed periodic public reports with the SEC; and

(b)     Uniti regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Uniti during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Uniti shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Uniti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Uniti; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

83.     Plaintiff incorporates ¶¶ 1-82 by reference as if fully set forth herein.

84.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Uniti common stock during the Class Period.

86.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Uniti common stock.  Plaintiff and the Class would not have purchased Uniti common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

87.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Uniti common stock during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

88.     Plaintiff incorporates ¶¶ 1-87 by reference as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Uniti within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Uniti, and their ownership of Uniti stock, the Individual Defendants had the power and authority to cause Uniti to engage in the wrongful conduct complained of herein.  Uniti controlled each of

the Individual Defendants and all of its employees.  By reason of such conduct, the Individual

Defendants and Uniti are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead

Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of

Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 23, 2019                     **PAUL BYRD LAW FIRM, PLLC**

---

. JOSEPH GATES Bar No. 2010239

Paul Byrd Law Firm, PLLC
415 N. Mckinley St., Suite 210
Little Rock, Arkansas 72205
Telephone: (501) 420-3050
Facsimile: (501) 420-3128
joseph@paulbyrdlawfirm.com

*Local Counsel for Plaintiff*

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

(*pro hac* pending)

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

(*pro hac* pending)

*Attorneys for Plaintiff*

EXHIBIT A

DocuSign Envelope ID: F0F92367-B701-46A8-A4E8-0F5C1BA87710

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Michael Avery, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint with my counsel and authorize its filing.

2.     I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.     I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 1/8/18 | 500 | $17.2181 |
| 12/12/18 | 300 | $17.924 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |

5.     I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of December, 2019.

DocuSigned by:

*Michael Avery*

46581A05B84FF4D9...

Michael Avery